# WELLS *v.* REYNOLDS.

PATENTS; PRIORITY OF INVENTION.

1. The grant of letters patent is *prima facie* evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty, and in cases of doubt that doubt should be resolved in favor of the pre-existing patent.

2. Where the testimony in an interference case involving the question of priority of invention bearing directly upon the *factum* of priority is unsatisfactory, but the other facts of the case show that the applicant, who is assailing a patent already issued, was a co-employee of the patentee, knew of the issuance of the patent shortly after its issue, made no suggestion that the invention was his, recommended the patent to purchasers, both orally and in writing, as the invention of the patentee, and asserted no claim to it until six months after the granting of the patent, and after he had left the employ of the company which then owned an interest in it, to accept employment in a rival company, the question of priority will be decided in favor of the pre-existing patent.

No. 12, Patent Appeals. Submitted May 14, 1894. Decided September 20, 1894.

HEARING on an appeal from the Commissioner of Patents in an interference proceeding. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Frank T. Brown* for the appellants.

*Messrs. Foster & Freeman* and *Mr. James H. Raymond* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an appeal from the ruling of the Commissioner of Patents, made in an interference proceeding, taken as between a prior patent and an application for a patent, for certain improvements in valve-controlling mechanism for hydraulic elevators. The question presented is solely as to the priority of invention claimed, as between two individuals, the appellant, George H. Reynolds, the holder of the prior

patent, and the appellee, William Wells, the applicant for a patent, and at whose instance the interference was declared.

It appears that Reynolds, the appellee, had obtained a patent or patents for operating the movement of elevators, and that such patent or patents had been assigned to the Crane Elevator Company, of Chicago; and at the time of obtaining such patent, both Reynolds and Wells were in the employ of that company. Subsequently, both Wells and Reynolds left that company, and became connected with the Standard Elevator Company, of Chicago—Wells as superintendent and general manager, and Reynolds as mechanical engineer. These two companies were rivals in the manufacture and sale of elevators.

The Standard Company desired to manufacture elevators that would not infringe the prior patent granted to Reynolds, and then owned by its rival, the Crane Elevator Company; and the question arose and was discussed, as to how the prior patent could be evaded or avoided. The counsel of the Standard Company, after investigation, advised that sheaves in the bottom of the shaft, having a horizontal motion and connected with the stopping and starting mechanism, would effect the desired result, without danger of infringing the prior patent held by the rival company. To give form and practical working effect to this suggestion, both Wells and Reynolds exercised their inventive ingenuity, and the result was that both claim to have been successful in devising the same modification of the prior patented invention.

In June, 1891, Wells filed two applications for patents, having reference to different parts and combinations of the same subject-matter, and upon those applications, in due course of proceeding, he obtained patents, issued to himself and the Standard Elevator Company jointly. These patents were issued on the 18th of August, 1891, and are numbered 457,844 and 457,845.

On the 6th of February, 1892, nearly six months after the issue of the patents to Wells, Reynolds made application for a patent for the same modification of his prior patent that Wells had covered by his claims and patents; and, upon filing his application, Reynolds, by his attorney, applied to the Commissioner of Patents to declare an interference between his application and the previous patents issued to Wells. Such interference was declared, and the regular proceeding was taken thereon.

The original declaration of interference embraced three counts, under three separate, distinct interferences, Nos. 15587, 15588, and 15589; but, by stipulation of the parties, with the approval of the Examiner of Interferences, the cases were consolidated under No. 15587. The issues in Nos. 15588 and 15589 became, respectively, counts 2 and 3 under No. 15587. The issues, as formulated in the Patent Office, are defined as follows:

"1st. The combination, with the cage, travelling cables, and an operating device, of sheaves arranged within the bights of the cables, and a carrier for said sheaves supported to reciprocate horizontally under the contracting and relaxing of the bights and connecting with the starting and stopping device of the engine.

"2d. The combination, with the travelling carriage, of two cords or cables connecting with an operating device on the car, horizontally movable sheaves near the bottom of the elevator shaft, around which the cables pass in opposite directions, and guiding sheaves at the top and bottom of the elevator shaft around which the cables pass, said cables being then attached to the car.

"3d. The combination, in an elevator with a travelling carriage, of two ropes or cables, each having one of its ends connected with a controlling device on the carriage, and their other ends secured to the car, horizontally movable sheaves around which the two cables respectively pass in opposite directions, and guiding sheaves near each

side of such pair of movable sheaves, and an adjustable support near the top of the well for the loops of the cables."

The principal matter at issue is the device by which the bottom sheaves have a horizontal position and movement, instead of the vertical movement of the sheaves in the prior patent issued to Reynolds.

The declaration of interference having been made, and testimony taken for the respective parties, the single question was presented for determination, Which of the two parties named was entitled to priority of invention?

The record shows that the case was fully and carefully examined and considered by the officers in the Patent Office, though there was a diversity of views entertained, and different conclusions were deduced from the evidence, by those officers. The Examiner of Interferences held that Reynolds was not entitled to priority as against the patents previously issued to Wells; and, on appeal to the three Examiners in Chief, that board concluded and held, that, "in fact, there was not much of invention in the matter anyway," and they did not find sufficient evidence to overcome Wells' patent, recognized and indorsed as it was by Reynolds, or to show that such patent was surreptitiously obtained, and they therefore affirmed the decision of the Examiner of Interferences awarding priority to Wells. From this decision Reynolds appealed to the Commissioner of Patents in person.

The Commissioner reversed the concurring decisions of the Examiner of Interferences and of the Examiners in Chief, and held that Reynolds was entitled to priority of invention. In the reasoning of the Commissioner, much stress is laid upon the fact of the non-production by Wells of certain sketches and drawings that were placed in his hands, and upon the apparent want of candor, and the improbabilities of his testimony, relating to the time and the circumstances at and under which he conceived the invention, and attempted to reduce it to form.

Wells swears that he conceived and sketched the invention in April, 1891, and that he made known the fact to his superior officer in the Standard Elevator Company, shortly thereafter. This officer, Beidler, the president of the company, corroborates the statement of Wells to a certain extent, but not in a very definite form. Reynolds swears that he first conceived the idea of the invention, and illustrated it by a sketch or drawing, on the 11th of May, 1891, upon an occasion when the question of adopting a device that would evade his former patent was being discussed, and that Wells, Brown, the attorney, and others, were present, participating in the discussion. That the sketch was the same day reduced to an accurate scale drawing, and signed by him as inventor, and by Wells and another as witnesses. Reynolds swears that this drawing, thus signed by him, was left in the hands and possession of Wells, and that it has not been produced, though he has required its production. Neither have the original sketches been produced. Wells swears that he has no such sketches or drawings in his possession and knows nothing of them.

The testimony bearing directly upon the *factum* of priority of invention is certainly very unsatisfactory; and if the case stood upon that testimony alone we should be inclined to agree with the Examiners in Chief, and conclude, as they said they would have concluded but for the other facts of the case, that Reynolds was the prior inventor and entitled to a patent. But there are other facts in the case, which, in the absence of countervailing evidence, are controlling in their effect, and which, we think, were not given their due and sufficient weight in arriving at his conclusion by the Commissioner of Patents.

It appears that some time in May, 1891, Wells handed sketches of the device in question to Smith, a professional draftsman, who made the drawings for Wells, to be filed by the latter with his application for patents. The application was filed in the Patent Office on the 13th of June, 1891,

and the patents were issued on the 18th of August, 1891; and Reynolds became acquainted with the fact of the issue of the patents a few days thereafter. At that time both Wells and Reynolds were in the employ of the Standard Elevator Company; and it was not until February 6, 1892, and a few days after he had left the employ of the Standard Company and resumed his connection with the Crane Company that he made his application to the Patent Office for a patent. Apart from this simple application for a patent, he has done nothing to adapt and render practical and complete the invention, whereas under the patents to Wells, the invention had been reduced to practice in a positive form.

Now, the pre-existing fact of the issue of the patents to Wells for the same invention, imposed upon Reynolds the burden of *proving beyond reasonable doubt* the priority of invention. The patent makes a strong *prima facie* case in favor of Wells. The grant of Letters Patent is *prima facie* evidence that the patentee is the first inventor of the device described in the Letters Patent and of its novelty; and in cases of doubt that doubt should be resolved in favor of the pre-existing patent. *Morgan* v. *Daniels*, 67 O. G. 811; 153 U. S., 120, 123. As said by a former Commissioner of Patents:

" It is only after he has overcome the patentee's *prima facie* case, arising from the previous grant of the patent, *by proof beyond reasonable doubt*, that he is entitled to have the burden of proof shifted to the patentee." Com. Dec. for 1891, p. 73.

But, in addition to this *prima facie* presumption in favor of the priority of invention, arising from the issue of the patent to Wells, there are other facts that weigh against the claim of Reynolds. The Standard Company was the joint owner of the Wells patent; and from the time of the alleged invention to February 1, 1892, Reynolds was in the employ of that company, and during that time he recommended parties to purchase elevators of the company, because of the

improvement of Wells' invention, and speaking of the improvement as patented to Wells, and in no manner suggesting any claim of his own. In his letter to Pabst, of Milwaukee, dated August 28, 1891, he says :

" When I was in your office a few days since, the question was raised by your people as to the right of the Standard Elevator Company to place an operating lever in its elevator cars. I take pleasure in enclosing herewith a patent granted to our Mr. Wells for the latest and best lever device yet brought out. This patent has been granted by the United States Government, with knowledge fresh in mind of all the recent controversies by the different elevator manufacturers before the Patent Office, in relation to lever devices. I hope this patent will be considered an answer to the question whether or not the Standard Company have the right to use a lever in the cars."

The right here so plainly recognized in the Standard Company to use the device in its elevators, certainly did not exist, if the claim of Reynolds now asserted be well founded. He was either recognizing what he knew at the time to be the right of the matter, or he was attempting to deceive and mislead both his employer and the public.

It further appears in the testimony of Wells, which could have been easily refuted if false, that Reynolds recognized and spoke of the invention patented to Wells, as being the invention of Wells; and to Mr. Leiter, then negotiating for the purchase of elevators from the Standard Company, Reynolds recommended the lever improvement of Wells, as being " for some reasons better than any other." This treatment of the invention is wholly inconsistent with the claim now made, that he, Reynolds, was the original and first inventor of the device. These declarations and recommendations of his, made both in writing and orally, amount to a disclaimer of any right in himself; and the claim now made to priority of invention, would seem to be an afterthought, and not given form until after he had gone back

and resumed his relation with the Crane Elevator Company.

It is true, in explanation of the delay in making his application for a patent, he says that he was advised by Wells and Brown not to make application. But he is an intelligent man, and has had considerable experience in obtaining patents, and he must be supposed to have known the effect in the Patent Office of undue delay, and failure to reduce his invention to a fixed, positive and practical form. If such advice was given, coming from the source it did, he must have known the motive, and the effect of following such advice, and therefore it could furnish him no excuse for the delay, nor, in the meantime, for treating the invention as belonging to Wells, and inducing third parties to deal with it as such. The strong inference from the conduct to which we have referred is, that Reynolds knew that he had no rightful claim as original inventor of the device, and hence he made no claim, until moved thereto by subsequent events.

There are other circumstances in the case, but the facts to which we have referred are the most important, and it is unnecessary to refer to the evidence in greater detail. Upon the whole, we concur in the conclusion reached by the Examiner of Interferences and the Examiners in Chief, that Wells is entitled to priority of invention, and we must therefore dissent from the conclusion reached by the Commissioner of Patents, that Reynolds is entitled to priority of invention. We shall therefore direct a certificate of the proceedings in this court and of this decision to be returned to the Commissioner of Patents, to be entered of record in the Patent Office, as the law directs.

*Reversed, and ordered to be certified to Commissioner of Patents.*